IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SHAWN D.R. AGUIRRE,

Petitioner,

vs.

JEANNE S. WOODFORD,

Respondent.

No. C 09-1256 LHK (PR)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

Petitioner, a state prisoner proceeding *pro se*, filed a second amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court ordered Respondent to show cause why the petition should not be granted. Respondent has filed an answer addressing the merits of the petition. Petitioner has filed an amended traverse. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claim presented and denies the petition.

**PROCEDURAL HISTORY**

On January 6, 2006, Petitioner was charged with gross vehicular manslaughter, reckless driving with bodily injury, engaging in a speeding contest, and reckless driving. On November 6, 2006, a jury found Petitioner guilty of all counts. On January 31, 2007, the trial court sentenced Petitioner to four years in state prison. On June 17, 2008, the California Court of Appeal affirmed in part and reversed in part. The Court concluded that reckless driving was a lesser

included offense to reckless driving with bodily injury, and thus, Petitioner could not be convicted of both crimes. The Court otherwise affirmed the convictions. Petitioner filed a petition for review in the California Supreme Court, which summarily denied Petitioner's petition on September 24, 2008. Petitioner commenced this federal action on March 23, 2009. Thereafter, the Court granted Petitioner's motion to file a second amended petition on April 15, 2010.

## BACKGROUND[1]

> Seventeen-year-old Michelle Krshul suffered fatal injuries in a motor vehicle collision on September 9, 2005, around 9:30 p.m. Appellant's pickup truck struck the driver's side of Krshul's Camaro while she was making a left turn at the intersection of West College Avenue (College) and Halyard Drive in Santa Rosa. She died immediately of a blunt force head trauma that fractured her skull.
>
> Prosecution's Case
>
> Appellant and his passenger, Jamie Saylor, appellant's friend of 10 years, were heading west on College on the night of September 9, 2005. College is an arterial street with a posted speed limit of 40 miles per hour. Appellant was driving his orange 1970 C10 Chevrolet pickup truck, which he had bought a few weeks earlier with the assistance of his stepfather, William James. The truck was a show piece, drove like new, and according to James, could reach 90 miles an hour in less than a quarter mile. Both appellant and Saylor assisted James on construction projects, including a local remodeling job on Morningside Circle, which is where the two young men had worked earlier on the day of the collision. After work, appellant and Saylor stopped at a friend's house where Saylor had a few cocktails. Appellant, who was not drinking alcohol, then drove Saylor to pick up a paycheck at James's house.
>
> Saylor testified that when they reached the red light at the intersection of Stony Point Road and College, a gray Mustang pulled up next to them in the left lane. Saylor thought he had seen the Mustang before on Morningside Circle, a few houses down from their worksite. FN2. Appellant's truck was in the right lane, and as Saylor looked to his left, he noticed an attractive blond woman in the Mustang's passenger seat, and a young man driving. No words or gestures were exchanged between the occupants of the vehicles. When the light turned green, appellant crossed the intersection and pulled his truck in front of the Mustang because the right lane merged into the left at the entrance of a small shopping center. Saylor said this maneuver was not part of a race between the vehicles. Saylor further stated that he did not remember anything after appellant passed the Mustang except that he saw a car "[r]ight in front of us." Later, in the hospital, Saylor estimated that appellant was driving 90 miles an hour; however, this estimation came shortly after Saylor sustained a

---

[1] The facts of this case are taken from the California Court of Appeal opinion in *People v. Aguirre*, No. A116765, 2008 WL 2430032 (Cal. App. 1 Dist. June 17, 2008). (Resp. Ex. C ("Op.")).

head injury.

FN2. Beth Schwartz, whose mother lived on Morningside Drive, was the alleged owner of the Mustang. Schwartz invoked the Fifth Amendment and refused to testify.

Taralynda Sager was behind the vehicles at the Stony Point Road stop light. She testified at trial that the truck was in the left lane and the Mustang in the right. She also stated that appellant and the Mustang "drove off really fast . . . . [¶] When they took off, there was smoke coming from their tires, and I recall that [the orange truck] kind of was wobbly when it took off." Concerned about the vehicles in front of her, Sager held back. She explained, "[t]hey took off fast enough for me to not want to leave right away." At trial she could not recall which vehicle sped in front of the other before the lanes merged, although earlier during the investigation process she gave a statement to a police officer that the Mustang was in front.

Sager continued down College and eventually came upon the accident scene. When she arrived, she observed that a gray car took off without any damage. She also saw "a young man outside of the [truck] on the ground, another young man by the hood of the truck, [and] there was an older woman that was running from the gray car [Krshul's Camaro] that was stopped and the orange truck, asking for help."

The older woman Sager described was Sunshine Tait, who was on her way home from her daughter's house just before the accident occurred. Tait stopped at the stop sign at the intersection of Halyard Drive and College. Before she made her left turn onto College, she looked in her rearview mirror and noticed a car approach on Halyard, the distance of two to three houses behind. She also "noticed headlights at a distance on the left" heading west on College. She clarified that she probably saw only one set of lights when she first looked left, but later saw two sets of headlights where the westbound lane of College returns to two lanes after the shopping center. Tait proceeded forward after concluding that the vehicles on College were far enough away to turn safely. Her testimony continued, "I started to turn left, and I saw that the headlights were coming very quickly at me . . . . [L]iterally I thought oh, my God, they're hauling ass. My second thought was they were racing, because the cars were shimmying . . . and my immediate thought after that was oh, my God, if that car [behind] turns, they're going to hit them."

Tait checked her rearview mirror and saw that the car behind her was starting to turn right. Realizing that the vehicles would collide and that she was the only person around, Tait made an immediate u-turn. She saw the Mustang and pickup swerve exactly together like "synchronized swimmers." The Mustang, left of the truck, missed the Camaro. Tait described the collision between appellant's truck and Krshul's Camaro "[l]ike a bomb going off. The hoods of both the cars flew up. And they hit her like right near the driver's door, and both of the cars started to spin. Now [Krshul's] car just spun in place and then it just . . . stopped going like she had been in the westbound lane . . . [a]nd then the pickup truck was spinning wildly across the street, and it was on fire . . . . [¶] . . . [¶] I actually saw them spinning."

Tait pulled over, ran to the Camaro and felt for a pulse on Krshul's neck, which she did not find. She saw the driver of the truck limping away from his vehicle and yelling for help for his broken leg. She tried pulling

Saylor away from the burning pickup but was unable to manage on her own. A young man [Jeff Vizgard] appeared on the scene and dragged Saylor away.

Vizgard was turning onto College when he noticed smoke and fire about a half mile down the road. Apparently he did not see Tait, as he testified that no one was assisting when he arrived at the scene of the accident. After pulling Saylor away from the truck, he saw appellant limping and heard him say, "I'm very sorry . . . my life's over. [¶] . . . [¶] I'm going to jail."

Dr. Kelly Arthur, a board certified forensic pathologist, testified that Krshul had several small abrasions on her forehead, torso and lower chest. The upper first two vertebrae were shattered, and the cause of death was "blunt force head trauma." Arthur also stated that Krshul "did not have very extensive external injuries relative to her head injuries. She had very extensive internal head injuries, many of which were exposed through the laceration on the left side of her head. The outside of her body did not have a great number of injuries, though." Arthur did not find any fractures or internal lacerations below the neck. Krshul's clavicle, ribs, sternum, pelvis, hips and extremities were all intact. Arthur affirmed that the higher the impact speed, the more likely an autopsy would reveal an aortic tear or transaction. She stated, "I wouldn't expect to see [aortic injuries] at like 10 or 20 miles an hour. Getting up to 40 or 50 is where the likelihood increases." Krshul's aorta was not damaged.

Appellant had a fractured femur and, according to a paramedic who treated him on the scene, "he demonstrated to have possibly-to be confused, maybe like a brain injury, a closed-head injury, possibly, because he was doing the repetitive questioning." Saylor also suffered a broken femur, multiple lacerations and cuts, a torn liver and, as noted earlier, a head injury.

Sunshine Tait stayed on the scene and gave statements to officers in the Santa Rosa Police Department who came to investigate the accident. While the written statement recorded the time as 22:30 (10:30 p.m.), Tait testified that she wrote her statement at "about 12:30 at night." She further explained, "when I was trying to write my statement, for some reason I had a mental block, and I actually could not see the impact." Tait recalled, "[w]hen I handed the statement to the policeman, I said, I'm sorry, I'm not a very good witness because I can't recall the impact."

Tait left the accident scene, and while driving home she began screaming and crying hysterically. When she arrived home, she turned on the TV for distraction. At trial she said, "I remembered I looked at the TV, and instead of seeing what was playing on the TV, I started seeing like flashes of the accident. And at that point I saw the impact. And I realized I did. I suddenly saw the impact, and I realized I did see the impact and I could remember, so I got up immediately, and I called the police department." The dispatcher instructed Tait to write down what she remembered. She shared these memories with Officer Brian Kohlman during an interview eight to ten days later.

Kohlman, an officer for the Santa Rosa Police Department, led the investigation and reconstruction of the accident. As a motorcycle officer in the traffic bureau with 10 years of law enforcement experience, Kohlman had investigated over a hundred accidents; however, this was his first reconstruction as lead investigator. He had attended basic, intermediate and

advanced accident investigation schools and a traffic accident reconstruction course, but outside of his academic training, he had never preformed the analyses for reconstructing an accident.

Using momentum analysis and the resultant drag after impact method, Kohlman concluded that the truck was going 88.98 miles per hour on College before braking and colliding with the Camaro. FN3. He testified that after the initial impact, the truck and Camaro had an immediate secondary impact called a side slap, or kiss, which caused the Camaro to rotate more than 360 degrees and the truck to go "into a sideways slide" with a locked wheel. The truck "then hit the curb, jumped up on the curb, and then hit the tree" and rotated around the trunk until coming to its point of rest. Because the truck ran into obstacles which stopped its traveling distance, Kohlman relied on the Camaro's post-impact movement to determine the pre-impact movement of both vehicles. Kohlman testified, "[a]fter completing the calculations, I came up with a post-impact speed for the Camaro . . . at about 42 miles an hour." Assuming that both vehicles "depart [from impact] at about the same speed," Kohlman calculated that the truck hit the Camaro at 77.9 miles per hour, which indicated that appellant was driving 88.98 miles per hour before braking at the sight of Krshul's car.

FN3. According to Officer Kohlman, "[m]omentum analysis is a way of basically taking everything-when we're going from a point of rest, where the vehicles come to rest, we're identifying an area of impact, and then we're taking any pre-impact skid marks, tire marks, anything like that, we're taking that and we're specifically going from the time of impact to the point of rest, looking at skid evidence, rotation, and all of that, and we're going to actually be able to . . . come up with a speed prior to braking." RDA, the resultant drag after impact method, is a type of momentum analysis that factors in the rotation of the vehicles. Kohlman explained, "[a] vehicle, if it's hit and simply rolls out to a stop, there's going to be a resultant drag factor, but if a vehicle is hit and then rotates, and in this case [the Camaro] rotated more than one full revolution, about one-and-a-quarter revolutions, it's going to take more force or more torque to cause that car not only to rotate like that, but also to rotate and travel the distance that it traveled. So that fact, the rotation, that resultant drag factor both from a sideways and forward direction where you're getting an effect of that, that's going to get you more accurate representation of the speed."

Although Kohlman originally stated that he relied "solely on physical evidence," he later acknowledged upon cross-examination that he heavily depended on Sunshine Tait's recollections for his analysis even though he agreed that "some of them [her observations] were [incorrect]." For example, Tait was "very clear" that the Camaro was turning right on College, yet all the experts concluded that the Camaro was actually making a left turn. Kohlman stated that Tait's testimony about the location of the vehicles when she first saw them on College was "[m]ost likely not" correct. Tait misestimated her departure time from the accident scene by almost two hours, and could not recall the impact when first asked to write a statement. It was only after watching TV that she had "flashes of the accident." Even Kohlman stated that he doubted Tait's version of the actual impact, though he accepted her statements regarding the events immediately prior to and following the impact, albeit with some recharacterization. For example, Tait said the pickup truck was "spinning wildly across the street" after impact. Kohlman alternately

called the truck's post-impact movement a "rotation sideways," a "sideways slide," "a little bit sideways, just a little," and a "veering off the roadway."

Kohlman conceded that based on the physical evidence, he originally thought the truck was in the left westbound lane and the Mustang in the right lane just before impact until Tait said the Mustang was left of the truck, in the turning lane. Kohlman also assumed that the Camaro spun as Tait described, although there were no markings on the Camaro's fluid trail that would indicate that its tires circled over the liquid. He also could not explain the lack of skid marks that a rotating vehicle would ordinarily lay on the pavement. According to Kohlman, neither car spun "like a top." He explained that a car is more likely to rotate the further it is hit from its center of mass. He then admitted that the whole bodies of the Camaro and truck made contact in the secondary impact. Kohlman estimated that if the Camaro did not rotate one-and-one-quarter turn, it would indicate the truck was traveling at 63 miles per hour before braking.

Kohlman also acknowledged that he discounted a short skid mark in the vicinity of the collision because it did not comport with Tait's version of events. Originally, Kohlman thought the Mustang left this mark, which would have revealed that the Mustang was traveling 27 miles per hour before braking and therefore was not racing the truck. However, after talking to Tait, Kohlman dismissed the skid as irrelevant. Contrary to expectations, no other tire marks were found to show that the Mustang slammed on the brakes after allegedly racing appellant.

Officer Kohlman agreed with defense counsel that accelerating to gain possession of a single lane at a merge is not necessarily a race, and it is not illegal if done safely and below the speed limit.

Robert Kopriva, an officer with the Santa Rosa Police Department for over 25 years, assisted Kohlman with his investigation and reconstruction. Like Kohlman, Kopriva did a momentum analysis using a computer simulation program to determine the speed of the vehicles before impact. In order for the simulation to match the physical evidence left at the accident scene, Kopriva made several adjustments to his calculations and then concluded that appellant was traveling at 86 miles per hour before braking, and 73 miles per hour at impact. Although there was no evidence of the Camaro's speed, he assumed that Krshul accelerated to 11 miles per hour before the collision. Kopriva described his analytical approach, saying, "I changed the speeds of the vehicles. I started as high as 100 miles an hour, went down as low as 50 . . . on the pickup truck, and I moved where they contacted, and I couldn't come up with anything close until I got to these locations and speeds."

Kopriva also ran a crush analysis, despite his belief that "the crush on these two vehicles would not reflect an accurate speed because of the type of damage involved." FN4. He further explained, "with this vehicle [the truck], because of the crush and the added resistance, it's always going to show a lower speed than what it was involved in." Kopriva's crush analysis calculated that appellant's truck traveled at 53 miles per hour at impact and 69 miles per hour before braking. His crush analysis did not take into account that the truck did not have a front bumper, which Kopriva admitted would make "a mile or two an hour difference." He noted that reconstruction is "not an exact science."

FN4. Defense expert David Schmidt later explained crush analysis as "making several measurements of the deformed material; actually, the measurement of the depth of crush on each of the vehicles." As a rough estimate, "[t]he depth of crush measured in inches is produced in crashes when the velocity is approximately numerically equivalent to those inches. Six inches of crush would be a six-mile-an-hour impact."

Defense Case

Two experts testified on behalf of appellant that Officers Kohlman and Kopriva's analyses were inconsistent with the physical evidence left at the scene of the accident. David Schmidt, an accident reconstructionist since 1968, testified that under Kohlman and Kopriva's theory, investigators should have found four of the truck's tire marks on the pavement; however, only two tire marks were seen. Schmidt said, "if the road surface and the tires on the truck are capable of making these marks, I would expect to see one mark for each tire, or there should be four marks out there, not just two." According to Schmidt, Kohlman misidentified the source of some of the marks, which means that his post-collision analysis was mistaken.

Schmidt also testified that Kohlman inappropriately assumed the Camaro rotated after impact although there is no physical evidence to support this theory. He noted that three tire marks were missing. When asked about the probability that two vehicles on the same road, traveling in the manner Kohlman depicted, would not leave their expected tire marks, Schmidt stated, "[t]hat wouldn't occur." Additionally, according to Schmidt, Kohlman made errors regarding the truck's wheel base, length and weight when using the EDSMAC software program to digitally reconstruct the accident. Kohlman's simulation data indicated that the vehicles would have had a 10-mile-an-hour difference in speed post-impact, yet all the experts agreed that the post-impact speed of the vehicles would have been approximately the same. This inconsistency indicated that Kohlman's simulation was faulty.

Schmidt conducted his own reconstruction of the accident using vector momentum analysis, energy analysis and crush analysis. FN5. He concluded that the Camaro traveled at a constant speed of five miles an hour before impact, and "[t]he pickup truck, on the other hand, was going somewhere between 45 and 50 up to a little less than two seconds before impact." After braking and steering, the impact speed was between 30 and 35 miles per hour. Schmidt's crush analysis supported his conclusions. Schmidt stated that Officer Kopriva's crush analysis used inappropriate vehicle measurements, relied on Kohlman's flawed data, and "[t]here's systematic error in the fact that none of [the measurements] are adjusted for the lack of a bumper." Furthermore, Kopriva's EDSMAC software could not accommodate the side slap. Finally, Schmidt testified that Krshul's "injuries are inconsistent with . . . high velocities."

FN5. Officer Kohlman stated that vector analysis is "a way of determining pre-impact speeds from taking a collision where the vehicles come to a point of rest, you identify where the area of impact is, and so taken from the area of impact and the points of rest you can actually work that back and come out with a pre-impact speed for the vehicles." Neither Kohlman nor Schmidt provided an explanation of energy analysis.

Dr. Richard Mason, a forensic pathologist and the sheriff coroner in Santa Cruz County, also testified that the prosecution's theories were inconsistent with the physical evidence. Focusing his attention on Krshul's injuries, he concluded that they "[were] not compatible with a 77-mile-an-hour impact." He stated, "[i]f in fact you had a 70-plus-mile-an-hour impact, I would expect her Camaro would have been penetrated to the center line of the interior compartment. You would have major forces going into her left shoulder, her left arm, left chest, pelvis, left femur. I would expect to see major numbers of broken ribs. I would expect to see the heart drift towards the left and shear off the aorta. I would expect to see a laceration of the lung . . . . I would expect the spleen to be shattered. I would expect liver lacerations. [¶] . . . [¶] None of those injuries are present in this case, so there is no 70-miles-an-hour impact." Mason concluded that Krshul died when her head went outside the Camaro's driver's side window and hit the truck twice, once on the hood and once on the door of the truck during the side slap. Krshul's hair, found on the door of the truck after the accident, was evidence of this impact. Mason estimated that these injuries and cause of death were consistent with a 30-to-35-mile-per-hour impact speed. Appellant and Saylor's relatively minor injuries also indicated that it was not a high speed crash.

The defense also submitted a Santa Rosa Police Department speed survey of College, approved on March 9, 2005, which showed that 85 percent of the people driving on College drove 45 miles per hour, and that drivers traveling in the westbound lanes typically drove faster than those going east.

Rebuttal

On rebuttal, Kohlman asserted that Schmidt's vector analysis was not the proper method for reconstructing the accident because it relied on approach and departure angles and where the vehicles came to rest. As Kohlman pointed out, "the pickup truck had had the secondary impact with the tree, so we're not getting a true distance of how much it would have traveled if it had not hit the tree." Additionally, according to Kohlman, Schmidt's analysis did not take into consideration the rotation of the vehicles, which meant his calculations assumed less energy was required to go the same distance than if they had spun. Schmidt improperly calculated the measurement of the truck because he did not use a certified scale, and roughly estimated the truck's length with a tape measure. Additionally, his drag factor, an important coefficient in his computer simulation, was too low. Kohlman asserted that the coefficient Schmidt gave would be similar to "a road surface covered with ice." FN6. Furthermore, Schmidt's analysis could not explain how the truck rotated around the tree. Kohlman also testified that Krshul was wearing a seat belt, and stated that there was no evidence her head struck the hood of the truck after impact. FN7.

FN6. Kohlman said that Schmidt used a drag factor of .10 or .12, while in fact the minimum drag factor would be .235, and that would be "as if the [Camaro] was hit from behind and rolled to a stop" without a secondary impact, rotation or skid across the pavement.

FN7. In earlier testimony, Kohlman spoke of finding Krshul's hair on the door of the truck. By stating that there was no evidence that Krshul's head hit the hood of the truck, Kohlman implicitly disagreed with Dr. Mason's theory that Krshul's head hit the truck twice.

(Op. at 2-12.)

**DISCUSSION**

A. Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence

presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. The Court must presume correct any determination of a factual issue made by a state court unless Petitioner rebuts the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). Here, that decision is the opinion of the California Court of Appeal.

B. Petitioner's Claim

Petitioner raises the following claim in his federal habeas petition: the trial court's instruction on the maximum speed law violated his due process right to a determination of each element of the offense.[2] Petitioner claims, and Respondent concedes, that the trial court's instruction to the jury on the maximum speed law was erroneous. Specifically, the trial court instructed the jury that the maximum speed law was 40 miles per hour. In actuality, the posted speed limit was 40 miles per hour. In contrast, California Vehicle Code regarding maximum speed law provides that "no person may drive a vehicle upon a highway at a speed greater than 65 miles per hour." Cal. Vehicle Code § 22349(a). Petitioner argues that this erroneous instruction violated his right to due process because it omitted an element of the offense. Petitioner further argues that the error had a substantial and injurious effect in determining the jury's verdict because it "made it easier to find gross negligence" as required to convict him of gross vehicular manslaughter. (Second Amended Petition ("SAC") at 13.)

The trial court gave the following relevant instructions to the jury:

> To prove that the defendant is guilty of gross vehicular manslaughter, the People must prove that (1) the defendant drove a vehicle, (2) while driving that vehicle, the defendant committed a misdemeanor or infraction or an otherwise lawful act that might cause death, (3) that the defendant committed the misdemeanor or infraction or otherwise lawful act that might cause death with gross negligence, and (4) the . . . defendant's grossly negligent conduct caused the death of another person.

---

[2] Petitioner's second amended petition deleted two of the three claims initially raised in his amended petition because they were unexhausted. Thus, only one claim remains.

> The People allege that the defendant committed the following misdemeanors and infractions: speed contest, speeding, and reckless driving. . . . Instructions 2201[3], 595[4], and 2200[5] tell you what the People must prove in order to prove that the defendant committed speed contest, speeding, and reckless driving. . . .
>
> The People also allege that the defendant committed the following otherwise lawful act that might cause death: merging into through traffic.
>
> Gross negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when (1) he or she acts in a reckless way that creates a high risk of death or great bodily injury, and (2) a reasonable person would have known that acting in that way would create such a risk. In other words, a person acts with gross negligence when he or she acts -- when the way he or she acts is so different from how an ordinarily careful person would act in the same situation that his or her act amounts to a disregard for human life or indifference to the consequences of that act.
>
> The People allege that the defendant committed the following misdemeanors, infractions, and lawful acts that might cause death: speed contest, speeding, reckless driving, and merging into through traffic. You may not find the defendant guilty unless all of you agree that the People have proved that the defendant committed at least one of these alleged misdemeanors, infractions, or acts and you all agree on which misdemeanor,

---

[3] "To prove that the defendant is guilty of [engaging in a speed contest], the People must prove that: (1) The defendant drove a motor vehicle on a highway; AND (2) while so driving, the defendant willfully engaged in a speed contest. Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. A person engages in a speed contest when he or she uses a motor vehicle to race against another vehicle. . . ." (CT 343.)

[4] "To prove that the defendant committed a violation of the maximum speed law, the People must prove that: (1) The defendant drove a vehicle on a highway; AND (2) The defendant drove faster than forty miles per hour mph." To prove that the defendant committed a violation of the basic speed law, the People must prove that: (1) The Defendant drove a vehicle on a highway; AND (2) The defendant drove faster than a reasonable person would have driven considering the weather, visibility, traffic, and conditions of the highway or at a speed that endangered the safety of other people or property." (CT 341.)

[5] "To prove that the defendant is guilty of [reckless driving], the People must prove that: (1) The defendant drove a vehicle on a highway; AND (2) The defendant intentionally drove with wanton disregard for the safety of persons or property. A person acts with wanton disregard for safety when: (1) he or she is aware that his or her actions present a substantial and unjustifiable risk of harm, and (2) he or she intentionally ignores that risk. The person does not, however, have to intend to cause damage. If you conclude that the defendant drove faster than the legal speed limit, that fact by itself does not establish that the defendant drove with wanton disregard for safety. You may consider the defendant's speed, along with all the surrounding circumstances, in deciding whether defendant drove with wanton disregard for safety. . . ." (CT 342-43.)

infraction, or act the defendant committed.

(Resp. Ex. B, Docket No. 46, RT 67-68.)

A jury instruction that omits an element of an offense is constitutional error subject to "harmless error" analysis. *See Neder v. United States*, 527 U.S. 1, 8-11 (1999); *Evanchyk v. Stewart*, 340 F.3d 933, 940 (9th Cir. 2003). Harmless error applies whether the error is characterized as a misdescription of an element of an offense in a jury instruction, or as an omission of the element. *See California v. Roy*, 519 U.S. 2, 5 (1996) (omission of "intent" element from aiding and abetting instruction subject to harmless error analysis where jury could have found intent based on evidence it considered); *Evanchyk*, 340 F.3d at 940-41 (violation of due process based on jury instructions that omitted "intent" element of first-degree felony murder subject to harmless error analysis). In a habeas proceeding, the omission will be found harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Roy*, 519 U.S. at 4 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The California Court of Appeal concurred with the parties' statement that the jury instruction regarding the maximum speed law was erroneous. Petitioner argued that the erroneous instruction was prejudicial because the jury likely convicted him of gross vehicular manslaughter based on a violation of the maximum speed law, and without regard to whether the other alleged offenses or infractions were committed with gross negligence. In addition, Petitioner argues that, at the very least, the error could have allowed the jury to find gross negligence more easily than it would have otherwise. The Court of Appeal rejected Petitioner's argument, and concluded that the error was harmless.

> It is uncontested that the accident took place when it was dark, on an arterial street in a semi-residential area, with oncoming traffic and a series of intersections, and there is virtually no evidence to suggest that appellant was not exceeding the posted speed limit. Officers Kohlman and Kopriva offered a number of possible pre-braking speeds, ranging from 63 to 89 miles per hour, depending on the assumptions and coefficients used for the reconstruction simulation. Even defense expert David Schmidt admitted that appellant was speeding, as he estimated that appellant was driving "between 45 and 50 up to a little less than two seconds before impact." Kohlman suggested Schmidt underestimated the speed by failing to accurately account for the resistance between the tires and the pavement or the rotation of the Camaro. Kohlman stated that the simulation coefficients Schmidt "provided in the reports . . . would represent a drag factor similar to a road surface covered with ice." In addition, Taralynda Sager recalled the cars "drove off

really fast [¶] . . . [¶] [with] smoke coming from their tires," and Sunshine Tait testified that appellant and the Mustang were "hauling ass." Jamie Saylor estimated that appellant was driving 90 miles per hour.

The main evidence offered to show the truck was not traveling at the speeds the prosecution presented was the medical evidence that Krshul did not sustain injuries below her neck. Defense experts Schmidt and Dr. Mason noted that Krshul's aorta was undamaged, which becomes less likely the higher the speed of the crash. However, the prosecution's pathologist, Dr. Arthur, said, "[t]he literature that I'm aware of states that . . . in [only] 15 to 20 percent of motor vehicle collisions there will be an aortic injury." The defense also submitted a speed survey to suggest that many other drivers considered it safe to exceed the speed limit on College. Yet this survey showed that 85 percent of drivers traveled no more than five miles per hour over the posted limit, during the day. The prosecution's evidence suggested that appellant drove between 23 and 49 miles per hour over the posted limit, at night. Thus, the survey does not detract from the evidence that appellant acted in a "reckless way that create[d] a high risk of death or great bodily injury," and that "[a] reasonable person would have known that acting in that way would create such a risk." (Citations omitted.)

Appellant argues that his convictions of engaging in a speed contest and reckless driving are irrelevant to the analysis of vehicular manslaughter. Reckless driving requires "consciousness of the results with intent to omit or do an act, realizing the probable injury to another; or acting in reckless disregard of the consequences; or conduct exhibiting reckless indifference as to the probable consequences with knowledge of likely resulting injury." (*People v. Allison* (1951) 226 P.2d 85, 101 Cal. App. 2d Supp. 932, 934.)

According to appellant, his reckless driving conviction required only proof of a "willful or wanton disregard for the safety of persons or property" (§ 23103, subd. (a)), while gross negligence, required for the manslaughter conviction, is behavior that "creates a high risk of death or great bodily injury" and shows a "disregard for human life or indifference to the consequences." (CALCRIM No. 592; *People v. Bennett*, *supra*, 54 Cal. 3d at p. 1036, 2 Cal. Rptr. 2d 8, 819 P.2d 849.) Appellant offers two illustrations to demonstrate the difference. He suggests "[a] person who drives his pickup truck into a wood rail fence at 20 miles per hour, knowing he will destroy the fence and may damage his vehicle is guilty of reckless driving because he disregards the safety of the property; a person who turns right at 5 miles an hour into a crowded crosswalk heedless of the danger to pedestrians is also guilty, because he disregards the safety of persons; neither is guilty of gross negligence . . . because the circumstances of the driving do not imply a high risk of death or disregard for human life."

We agree that the reckless driving conviction does not necessarily establish the mental state required for gross negligence, but appellant's other convictions do demonstrate the jury accepted the prosecution's theory that appellant was driving recklessly in a speed contest. Unlike appellant's examples, here there was overwhelming evidence that appellant's truck was traveling at a speed far exceeding the prima facie and basic speed laws, with no evidence that his driving was "reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway." (§ 22350.) To the contrary, appellant's driving demonstrated "more than ordinary carelessness, inattention, or mistake in judgment" that created "a high risk of death or great bodily injury." (CALCRIM No. 592; *see People v. Wells*

> (1996) 12 Cal. 4th 979, 990, 50 Cal. Rptr. 2d 699, 911 P.2d 1374 [gross vehicular manslaughter conviction upheld for defendant who drove between 50 and 80 miles per hour on a curvy road and struck another vehicle, killing the passenger]; *compare People v. Durkin* (1988) 252 Cal. Rptr. 735, 205 Cal. App. 3d Supp 9 [misdemeanor conviction of vehicular manslaughter with ordinary negligence under Penal Code 192, subd. (c)(2), for defendant driving 30 to 35 miles per hour who slammed on the brakes and changed lanes to avoid sudden traffic, skidded across double yellow line and collided with an oncoming ambulance, killing defendant's passenger].) We find it clear, beyond a reasonable doubt, that the jury would have convicted appellant even in the absence of the erroneous instruction.

(Op. at 15-17.)

Petitioner has not demonstrated that the California Court of Appeal's findings of fact were unreasonable. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007) ("[A] federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable."). Despite Petitioner's arguments regarding the conflicting evidence at trial, on federal habeas review, "state court findings of fact are presumed correct unless rebutted by clear and convincing evidence or unless based on an unreasonable evidentiary foundation." *Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003), *citing* 28 U.S.C. §§ 2254(d)(2) & 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (stating that such factual determination should be overturned only if "objectively unreasonable").

Here, the evidence demonstrated, and the jury concluded, that prior to braking, Petitioner was engaged in a speeding contest, and drove recklessly, estimated to be driving anywhere from 45 to 89 miles per hour in a semi-residential street on a dark night. Even without the erroneous instruction, it is a reasonable determination to conclude that a jury would have found that Petitioner acted with gross negligence; i.e., that driving so quickly as to cause witnesses to see the truck "shimmying," in a semi-residential neighborhood, in order to race against the Mustang before merging into one lane, at night, "create[d] a high risk of death or great bodily injury," and a reasonable person would have known that.[6] *See Fry*, 551 U.S. at 119. Further, even if the

---

[6] To the extent Petitioner claims that the erroneous instruction may have contributed to the misdemeanor convictions, the Court concludes that he failed to properly raise this argument in his second amended petition. *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("[t]raverse is not the proper pleading to raise additional grounds for relief."). Nevertheless, this claim is based wholly on speculation. A review of the evidence demonstrates that the erroneous

Court of Appeal's conclusion that the error was harmless was a close call, it is not a close call when the additional layer of deference to the state court is given, as this Court is required to do, under the "unreasonable application" standard of Section 2254(d)(1); *cf. Harrington v. Richter*, 131 S. Ct. 770, 785-85 (2011) ("state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision") (internal quotation marks omitted).

Accordingly, the California Court of Appeal's conclusion that the erroneous instruction was harmless was not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

**CONCLUSION**

For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: 8/8/11

Lucy H. Koh
LUCY H. KOH
United States District Judge

---

maximum speed law instruction did not have a substantial or injurious effect on the verdicts of the reckless driving or speed contest convictions.